UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE GOVERNMENT OF PUERTO RICO, Represented by its Attorney General, the HON. DENISSE N. LONGO QUIÑONES,<br><br>Plaintiff,<br><br>vs.<br><br>HITACHI AUTOMOTIVE SYSTEMS, LTD., HITACHI AUTOMOTIVE SYSTEMS AMERICAS, INC., DENSO CORPORATION, and DENSO INTERNATIONAL AMERICA, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. Num. 20-<br><br>Re: Unjust Enrichment<br><br><br>JURY TRIAL DEMANDED |

COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW,** Plaintiff, The Government Of Puerto Rico, Represented by its Attorney General, the Hon. Dennise Longo Quiñones, on behalf of the Government of Puerto Rico and in *parens patriae* on behalf of the population of Puerto Rico and its governmental agencies, and very respectfully states and prays:

## **NATURE OF ACTION**

1. This lawsuit is brought against Defendants Hitachi Automotive Systems, Ltd., Hitachi Automotive Systems Americas, Inc. (together, "Hitachi"), DENSO Corporation and DENSO International America, Inc. (together, "DENSO") (collectively, "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of Air Flow Meters (defined below) for engaging in

1

a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Air Flow Meters in violation of the Clayton Act and for unjustly enriching the defendants at the cost of unjust impoverishment of the consumers and governmental agencies of Puerto Rico. Plaintiff brings this action on behalf of the Government of Puerto Rico and in *parens patriae* on behalf of the population of Puerto Rico and its governmental agencies, for damages incurred during the period from and including January 1, 2000 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Period"), who purchased or leased a new vehicle in Puerto Rico for government or personal use and not for resale which included one or more Air Flow Meter(s) as a component part, or indirectly purchased one or more Air Flow Meter(s) as a replacement part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

2.      "Air Flow Meters" measure the volume of air flowing into engines and are part of the engine management systems and automotive sensors segment of the automotive market.

3.      The Defendants manufacture, market, and sell Air Flow Meters throughout and into the United States.

4.      The Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, and allocate market shares for Air Flow Meters in violation of the Clayton Act.

5.      The U.S. Department of Justice's ("DOJ") Antitrust Division conducted a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry that was winding down by the end of 2019.

6.      As part of its criminal investigation, the DOJ sought information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and

2

the Federal Bureau of Investigation ("FBI") participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.

7.      The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.

8.      The cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $1.6 billion in criminal fines.

9.      The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

10.     On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to plead guilty and pay a $195 million criminal fine for its role in a conspiracy to fix prices of automotive parts, including Air Flow Meters, installed in automobiles manufactured and sold in the United States and elsewhere.

11.     Hitachi sold price-fixed automotive parts, including Air Flow Meters, to automobile companies headquartered in the United States.

12.     The companies to which Hitachi sold automotive parts include Ford Motor Company and General Motors, LLC.

13.     Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, Air Flow Meters sold to automobile manufacturers in the United States and elsewhere.

14.     The combination and conspiracy engaged in by the Defendants and their co-conspirators allowed Defendants and their co-conspirators to be unjustly enriched at the expense of the consumers and governmental agencies of Puerto Rico was an unreasonable restraint of

interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C.§1 and, under the Clayton Act,15 U.S.C. §26, the Government of Puerto Rico is entitled to an injunction, precluding defendants from continuing this illegal activity. .

15.    As a direct result of the unlawful conduct alleged herein, consumers and governmental agencies of Puerto Rico  paid artificially inflated prices for Air Flow Meters during the Period and have thereby suffered injury to their business or property.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Action (15 U.S.C. § 26). This Court also has jurisdiction over the Puerto Rico law claim under its pendent jurisdiction.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act (15 U.S.C. §22 and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District; a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District; and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

18.    This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Air Flow Meters throughout the United States, including in this District; and (c) had substantial aggregate contacts with the United States as a whole, including Puerto Rico, were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or

doing business throughout the United States, including in this District.

19.     The Defendants also conduct business throughout the United States, including Puerto Rico , and have purposefully availed themselves of the laws of the United States and Puerto Rico.

20.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States, including Puerto Rico.

21.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States, including Puerto Rico.

22.     The Defendants' products are sold in the flow of interstate commerce, including Puerto Rico.

23.     Air Flow Meters manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.

24.     To the extent any Air Flow Meters are purchased in the United States, and such Air Flow Meters do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce, including Puerto Rico.

25.     The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused injury to Plaintiff and the population of Puerto Rico.

26.     By reason of the unlawful activities hereinafter alleged, the Defendants substantially affected commerce throughout the United States, including Puerto Rico, causing injury to the government of Puerto Rico and consumers in Puerto Rico, whom the Attorney

General represents *parens patriae* in this case.

27.     The Defendants, directly and through their agents, engaged in activities affecting all United States jurisdictions, including Puerto Rico, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Air Flow Meters, which conspiracy unreasonably restrained trade, adversely affected the market for Air Flow Meters, and unjustly enriched Defendants at the expense of the population of Puerto Rico and the governmental agencies of Puerto Rico.

28.     The Defendants' conspiracy and wrongdoing described herein adversely affected Puerto Rico consumers and governmental agencies who purchased Air Flow Meters for personal use and not for resale.

## PARTIES

### Plaintiff

29.     During the Period, the consumers and governmental agencies of Puerto Rico purchased Air Flow Meters manufactured by Defendants for personal/governmental use and not resale, and thereby suffered the harm described herein.

30.     Attorney General Longo Quiñones represents those consumers and governmental agencies in her *parens patriae* capacity.

### Defendants

31.     Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Flow Meters that were purchased throughout the United States, including in this District, during the Period.

32.    Defendant Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd.

33.    Hitachi Automotive Systems Americas, Inc. manufactured, marketed and/or sold Air Flow Meters that were purchased throughout the United States, including in this District, during the Period.

34.    Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Aichi Prefecture, Japan. DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Flow Meters that were purchased throughout the United States, including in this district, during the Period.

35.    Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. DENSO International America, Inc. –directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Air Flow Meters that were purchased throughout the United States, including in this District, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

## AGENTS AND CO-CONSPIRATORS

36.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

37.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently

unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

38.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The Air Flow Meters Industry

39.     An Air Flow Meter or mass air flow sensor, as it is more commonly known, measures the volume of air flowing into the automobile's engine, i.e., how much air is flowing through a valve or passageway. It does not measure the volume of the air passing through a tube; rather it measures the actual speed of the air flowing through the device in a defined time segment, i.e, seconds. Typically, the speed is measured as kilograms/second.

40.     Air density will vary due to temperature or use of forced induction in automobiles.

41.     The function of the sensor is to allow the engine to balance properly and to deliver the correct fuel mass to the engine to mix with air for combustion.

42.     Coupled with an oxygen sensor, the engine's air to fuel ratio can be controlled very accurately.

43.     In the average light vehicle, there are anywhere between 60-100 sensors on board.

44.     The mass air flow sensor belongs to the automotive sensors market.

45.     The specific segment of the sensor market that incorporates components of Air Flow Meters is the microelectromechanical ("MEMS") sensor market.

8

46.   According to Industry Expert's report "Global Automotive Sensors Market with Special Focus on MEMS Sensors," the automotive sensors market was a $16.2 billion industry in 2012.



47.   DENSO Defendants hold a global position of No. 2 overall for the entire automotive MEMS market. *See* Figure 1.

| Top 10 Automotive MEMS Manufacturer Revenues (Millions of US Dollars) | | | | |
|---|---|---|---|---|
| Rank | Company | 2011 Revenue | 2010 Revenue | Y/Y Growth (Decline) % |
| 1 | Bosch | $625 | $524 | 19% |
| 2 | Denso | $286 | $263 | 9% |
| 3 | Panasonic | $202 | $181 | 12% |
| 4 | Freescale | $191 | $190 | 1% |
| 5 | Sensata | $190 | $153 | 24% |
| 6 | Analog Devices | $161 | $136 | 18% |
| 7 | Infineon | $139 | $117 | 19% |
| 8 | VTI | $103 | $76 | 36% |
| Tie: 9 & 10 | GE Sensing | $64 | $57 | 12% |
| | Delphi | $64 | $62 | 3% |
| | Total Top 10 | $2,025 | $1,759 | 11% |

*Source: IHS iSuppli Research, June 2012*

Figure 1. MEMS Manufacturers' revenues by rank.

**HITACHI MANUFACTURED AIR FLOW METER**



**AIR FLOW METER DIAGRAM**



48.     Air Flow Meters are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.

49.     Air Flow Meters are also installed by OEMs in cars to replace worn out, defective, or damaged Air Flow Meters.

50.     For new cars, the OEMs—mostly large automotive manufacturers such as Ford Motor Company, Toyota Motor Corporation, General Motors LLC – purchase Air Flow Meters directly from Defendants.

51.     Air Flow Meters may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are also called "Tier 1 Manufacturers" in the industry.

52.     Tier 1 Manufacturers supply Air Flow Meters directly to an OEM.

53.     When purchasing Air Flow Meters, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts.

54.     Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.

55.     Typically, the bidding process for a particular model begins approximately three years prior to the start of production of a new model.

56.     OEMs procure parts for U.S.-manufactured vehicles in the United States and elsewhere.

57.     The Defendants and their co-conspirators supplied Air Flow Meters to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.

58.     The Defendants and their co-conspirators manufactured Air Flow Meters (a) in the United States and elsewhere for installation in vehicles manufactured and sold in the United States; (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States; and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

59.     Plaintiff purchased Air Flow Meters indirectly from the Defendants.

11

60.     By way of example, an owner of a vehicle may indirectly purchase one or more Air Flow Meter(s) from the Defendants as part of purchasing or leasing a new vehicle.

61.     An owner of a vehicle may also indirectly purchase for replacement one or more Air Flow Meter(s) from the Defendants when repairing a damaged vehicle or where one or more of the vehicle's Air Flow Meter(s) are defective.

**B.      The Structure and Characteristics of the Air Flow Meters Market Render the Conspiracy More Plausible**

62.     The structure and other characteristics of the Air Flow Meters market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.

63.     Specifically, the Air Flow Meters market: (1) has high barriers to entry; and (2) has inelasticity of demand.

**1.      The Air Flow Meters Market Has High Barriers to Entry**

64.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.

65.     Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

66.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Air Flow Meters market.

67.     A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

68.     The Defendants own several patents related to the manufacture of Air Flow Meters.

These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

69.     Moreover, within the Air Flow Meter industry, there is a significant amount of technology and engineering expertise required to build systems that fully comply with environmental and public health requirements and other regulatory standards including fuel economy requirements.

70.     In addition, OEMs cannot change Air Flow Meters suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Air Flow Meters they purchase for a vehicle are then integrated with the other components of the powertrain system of the particular vehicle model. Thus, the design must be synergized by the Air Flow Meters manufacturers and OEMs. It would be difficult for a new market entrant to do so.

## 2.     There is Inelasticity of Demand for Air Flow Meters

71.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

72.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

73.     Demand for Air Flow Meters is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Air Flow Meters as an

essential part of a vehicle, even if the prices are kept at a supra-competitive level.

     **C.**       <u>**Government Investigations**</u>

     74.     A globally coordinated antitrust investigation has taken place in the United States, Europe, and Japan, aimed at suppliers of automotive parts.

     75.     A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ and EC would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigations being conducted by the U.S., European and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

     76.     The DOJ Antitrust Division's broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry is the largest criminal investigation the Antitrust Division has ever pursued.

     77.     The cartel investigation of price-fixing and bid-rigging in the automobile parts industry has yielded more than $1.6 billion in criminal fines.

     78.     On September 26, 2013, the DOJ announced that Hitachi Automotive Systems, Ltd. agreed to plead guilty and pay a $195 million criminal fine and to plead guilty to a one- count criminal information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of certain automotive products, including Air Flow Meters, sold to automobile manufactures in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

     79.     According to the Information filed, Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators carried out the Air Flow Meters conspiracy by:

(a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply automotive parts, including Air Flow Meters, sold to automobile manufactures in the United States and elsewhere;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling automotive parts, including Air Flow Meters, to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for automotive parts, including Air Flow Meters, sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)    engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)    employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

**D.    Likely Existence of a Cooperating Defendant**

80.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.

81.    In most recent cases in which guilty pleas for price- fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."

82.    One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

83.    In light of the guilty plea in this case; the guilty pleas in related automotive parts antitrust cases; and the DOJ's investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**E.    Guilty Pleas in Related Markets in the Automotive Industry**

84.    On January 30, 2012, the DOJ announced that Yazaki Corporation ("Yazaki") had agreed to pay a $470 million fine and plead guilty to a three-count criminal information charging Yazaki with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and

elsewhere, from at least as early as December 2002 until at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (3) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to certain automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

85.     In addition to Yazaki, five executives from Yazaki (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Kazuhiko Kashimoto and Hisamitsu Takada – pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. These five Yazaki executives will each pay a $20,000 criminal fine and serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

86.     On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. ("Furukawa") had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses to automobile manufacturers.

87.     Three of Furukawa's executives also pleaded guilty to the same conspiracy.  The court sentenced two of the executives to 15 and 18 month prison sentences, to be served in the United States.

88.     On January 30, 2012, DENSO agreed to plead guilty to a two-count felony charge against DENSO for engaging in conspiracies to rig bids for and to fix, stabilize and maintain the

prices of electronic control units (ECUs) and heater control panels (HCPs) sold to automobile manufacturers in the United States and elsewhere.

89.     On March 26, 2012, a DENSO executive agreed to plead guilty in a criminal price-fixing and bid-rigging conspiracy involving the sale of heater control panels to automobile manufacturers.

90.     On April 26, 2012, another DENSO executive agreed to plead guilty to the same conspiracy.

91.     A number of additional companies have pleaded guilty to fixing the prices of other automotive parts, including: automotive wire harnesses; instrument panel clusters; fuel senders; heater control panels; occupant safety restraint systems; automotive bearings; windshield wipers; starters; radiators; alternators; ignition coils; anti-vibration rubber parts, air conditioning systems; automatic transmission fluid warmers; fan motors; switches; steering angle sensors; HID ballasts; and automotive lamps. These companies include: Fujikura Ltd.; GS Electech, Inc.; TRW Deutschland Holding GmbH; Autoliv, Inc.; Nippon Seiki Co., Ltd.; JTEKT Corporation; Mitsuba Corporation; Mitsubishi Electric Corporation; Mitsubishi Heavy Industries, Ltd.; NSK Ltd.; Panasonic Corporation; T. RAD Co., Ltd.; Tokai Rika Co.; Valeo Japan Co., Ltd.; and Yamashita Rubber Co., Ltd.

92.     Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy. She further stated: "By rigging bids . . . [automotive parts manufacturers engaged in a price-fixing conspiracy] inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars." She also explained that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S.

consumers."

93.    Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

94.    Ms. Pozen went on to say that there was no doubt that United States consumers were hurt financially by the cartel's activity.

95.    In a separate press statement, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers".

96.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena.

97.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

98.    On May 21, 2013, two DENSO Corporation executives agreed to plead guilty to conspiring to fix prices of Heater Control Panels. One of the two executives further agreed to plead guilty to conspiring to fix the prices of electronic control units, which regulate power windows, power locks and other electrical systems. The executives agreed to serve time in U.S. prison and pay a criminal fine.

99.    On July 10, 2013, the European Commission fined four wire harness suppliers, Yazaki, S-Y Systems, Furukawa Electric and Leoni, a total of $182 million for taking part in cartels that affected Toyota, Nissan, Honda and Renault.

100.    On July 18, 2013, Panasonic Corporation agreed to pay a $45.8 million fine and

plead guilty to price-fixing allegations involving turn, wiper and other switches and steering angle sensors sold to Toyota and high intensity discharge ballasts sold to Honda, Mazda and Nissan among others.

101.    On September 11, 2013, an executive of G.S. Electech, Inc. was indicted for a conspiracy to fix the prices of speed sensor wire assemblies.

102.    On September 11, 2013, two Fujikura, Ltd. executives were indicted for conspiring to fix the price of wire harness assemblies sold to Fuji Heavy Industries, the maker of Subaru automobiles.

103.    On September 24, 2013, a Panasonic Automotive Systems Corporation executive was indicted for a conspiracy to fix prices of switches and steering angle sensors sold to Toyota and installed in U.S. cars.

104.    On September 26, 2013, nine additional Japanese automotive suppliers, including Defendant Hitachi Automotive Systems, Ltd., and two more executives agreed to plead guilty to conspiracy charges and pay more than $740 million in fines for their roles in rigging the prices of 30 products.

105.    To date, 20 companies and 21 executives have been charged in the Antitrust Division's investigation into price fixing and bid rigging in the auto parts industry.

106.    Each of the twenty companies have either pleaded guilty or have agreed to plead guilty and have agreed to pay more than 1.6 billion in criminal fines.

107.    Seventeen of the twenty-one executives have been sentenced to serve time in U.S. prisons or have entered into plea agreement.

## PLAINTIFF AND THE POPULATION OF PUERTO RICO SUFFERED ANTITRUST INJURY

108.    The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Air Flow

Meters;

        (b)      The prices of Air Flow Meters have been fixed, raised, maintained, or stabilized at artificially inflated levels;

        (c)      Indirect purchasers of Air Flow Meters have been deprived of free and open competition; and

        (d)      Indirect purchasers of Air Flow Meters paid artificially inflated prices.

109.     During the Period, Plaintiff and the population of Puerto Rico paid supracompetitive prices for Air Flow Meters. These inflated prices have been passed on to them by OEMs and dealers.

110.     The markets for Air Flow Meters and vehicles are inextricably linked and intertwined because the market for Air Flow Meters exists to serve the vehicle market. Without the vehicles, the Air Flow Meters have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Air Flow Meters.

111.     As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

112.     Air Flow Meters are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Air Flow Meters follow a traceable physical chain of distribution from the Defendants to Plaintiff and the population of Puerto Rico, and any costs attributable to Air Flow Meters can be traced through the chain of distribution to Plaintiff, the population of Puerto Rico and its governmental agencies.

113.     Just as Air Flow Meters can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Air Flow Meters affect prices paid by indirect purchasers of new motor vehicles containing Air Flow Meters and

Air Flow Meters purchased for repair purposes.

114.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.

115.    The OEM and dealer markets for new motor vehicles are subject to vigorous price competition.

116.    The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Air Flow Meters lead to corresponding increases in prices for new motor vehicles and replacement parts at the OEM and dealer levels.

117.    When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing Air Flow Meters as components, overcharges are passed through to ultimate consumers, such as the indirect- purchasers, Plaintiff and the population of Puerto Rico and its governmental agencies.

118.    Hence, the inflated prices of Air Flow Meters both in new motor vehicles and those purchased for repair resulting from the Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have been passed on to Plaintiff, the population of Puerto Rico and its governmental agencies by OEMs and dealers.

119.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component.

120.    Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have

observed that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

121.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

122.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Air Flow Meters and, as a direct and foreseeable result, the price of new motor vehicles containing Air Flow Meters and the price of Air Flow Meters purchased for repair purposes.

123.     Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Air Flow Meters on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.

124.   A regression model can explain how variation in the price of Air Flow Meters affects changes in the price of new motor vehicles. In such models, the price of Air Flow Meters would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Air Flow Meters impact the price of new motor vehicles containing Air Flow Meters while controlling for the impact of other price-determining factors.

125.   The precise amount of the overcharge impacting the prices of new motor vehicles containing Air Flow Meters can be measured and quantified.

126.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiff and the population of Puerto Rico can be quantified.

127.   In addition to the regression analysis discussed above demonstrating impact on consumers, the Department of Justice's Antitrust Division, which has been investigating anticompetitive conduct in the automotive parts industry for some time, **has concluded that there is "no doubt" that consumers were hurt financially**.

128.   Sharis A. Pozen, then Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy. "By rigging bids . . . [automotive parts manufacturers engaged in a price-fixing conspiracy] inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars," Ms. Pozen said. She also explained that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."

129.   On February 15, 2013, Scott Hammond, then the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's automotive parts investigation in a

Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . .[The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. ***I say the biggest with respect to the impact*** on U.S. businesses and ***consumers***, and the number of companies and executives that are ***subject to the investigation***." (emphasis added).

130.    By reason of the violations of the antitrust law alleged herein, Plaintiff, the population of Puerto Rico, and its consumers have sustained injury to their businesses or property, having paid higher prices for Air Flow Meters than they would have paid in the absence of the Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, which should be enjoined permanently.

## PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because the Population of Puerto Rico and the Government Agencies of Puerto Rico Did Not And Could Not Discover Their Claims

131.    Plaintiff repeat and re-allege the allegations set forth above.

132.    Neither the population of Puerto Rico nor the governmental agencies of Puerto Rico had knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea.

133.    Plaintiff brings this action on behalf of the population of Puerto Rico and the governmental agencies of Puerto Rico who purchased or leased automobiles or purchased Air Flow Meters to replace or repair damaged or defective Air Flow Meters in their automobiles. They

had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea.

134.    No information in the public domain was available to the Plaintiff or the population of Puerto Rico prior to September 26, 2013, the date that the DOJ publicly announced Hitachi Automotive Systems, Ltd.'s anticipated guilty plea, that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Air Flow Meters.

135.    Plaintiff, the population of Puerto Rico and its governmental agencies, had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

136.    For these reasons, the statute of limitations as to Plaintiff's claims did not begin to run, and has been tolled with respect to the claims that Plaintiff has alleged in this Complaint.

   **B.   Fraudulent Concealment Tolled the Statute of Limitations**

137.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff.

138.    Plaintiff, Puerto Rico's government agencies, and the population of Puerto Rico did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea.

139.    Before that time, Plaintiff, Puerto Rico's government agencies, and the population of Puerto Rico were unaware of the Defendants' unlawful conduct, and did not know before then

that they were paying supracompetitive prices for Air Flow Meters throughout the United States during the Period.

140.   No information, actual or constructive, was ever made available to Plaintiff, Puerto Rico's government agencies, or the population of Puerto Rico that even hinted to them that they were being injured by the Defendants' unlawful conduct.

141.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

142.   By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.

143.   Air Flow Meters are not exempt from antitrust regulation, and thus, before September 26, 2013, Plaintiff, Puerto Rico's government agencies, and the population of Puerto Rico  reasonably considered the Air Flow Meters industry to be a competitive industry.

144.    Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Air Flow Meter prices before September 26, 2013.

145.   Plaintiff, Puerto Rico's government agencies, and the population of Puerto Rico could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

146.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, neither Plaintiff, Puerto Rico's government agencies,  nor the population of Puerto Rico had any knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether

a conspiracy existed, until September 26, 2013, the date that the DOJ publicly announced Hitachi Automotive Systems, Ltd.'s anticipated guilty plea.

147.   For these reasons, the statute of limitations applicable to Plaintiff's claims was tolled and did not begin to run until September 26, 2013.

## FIRST CLAIM FOR RELIEF
### Injunctive Relief 15 U.S.C. § 15

148.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

149.   Plaintiff asks this Court to enjoin Defendants from continuing to violate the Clayton Act.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment and Disgorgement of Profits (31 L.P.R.A.)

150.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

151.   By paying more for products containing Air Flow Meters than it would have been in the absence of Defendants' wrongful conduct, consumers and governmental agencies of Puerto Rico have conferred a benefit on Defendants.

152.   As a result of Defendants' wrongful conduct, Defendants were able to charge more for Air Flow Meters and vehicles which overpayments were made by consumers and governmental agencies of Puerto Rico.

153.   Defendants have been unjustly enriched by Plaintiff consumers and governmental agencies of Puerto Rico's overpayments.

154.   Equity demands that Defendants be required to make restitution and return the overpayment to Plaintiff.

155.   Plaintiff seeks disgorgement of all monies resulting from such overpayments and establishment of a constructive trust from which Plaintiff may seek restitution.

156.   Plaintiff files this Complaint on its own behalf, for its governmental entities, and as

*parens patriae* for all persons who reside or resided in Puerto Rico to enforce public rights and to protect its residents from Defendants' unjust enrichment.

157.    Defendants' conspiracy enriched them unjustly.

158.    Defendants' enrichment resulted in harm [impoverishment] of Plaintiff.

159.    There is a connection or Nexus between the loss [impoverishment] of Plaintiff and the enrichment of Defendants.

160.    There is no cause that justifies the enrichment.

161.    There is no legal principle that excludes the use of unjust enrichment.

162.    There is no adequate legal remedy to correct the harm to Plaintiff.

163.    As a consequence of the intentional, malicious, and negligent actions committed in bad faith by all the Defendants, the patrimony of everyone represented by Plaintiff diminished significantly and all Defendants benefitted in that way increasing their patrimony substantially, so that Plaintiff in representation of the consumers and governmental agencies of Puerto Rico, demands that all Defendants, restore and indemnify Plaintiff for the unjust enrichment in which they have engaged, which is estimated in an amount no less than $50,000,000.00 plus interest.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiff respectfully requests that:

A.    That the Defendants' conduct, contract, conspiracy, or combination, and related acts and practices alleged in this complaint be adjudged and decreed to have unjustly enriched them at Plaintiff's expense;

B.    That Defendants be ordered to cease all cooperative agreements, joint ventures, cross-license agreements, or other arrangements used to facilitate the conspiracy alleged in this complaint and that the same be adjudged rescinded or dissolved;

C.    That Defendants reimburse for the amounts by which the consumers and

governmental agencies in Puerto Rico were impoverished by the unjust enrichment of Defendants in an amount not less than $50,000,000;

      D.      That Plaintiff be awarded such additional amounts as provided by law;

      E.      That Plaintiff be awarded pre- and post-judgment interest at the highest legal rate;

      F.      That Plaintiff be awarded all costs of investigation, costs of litigation, including court costs and reasonable attorneys' fees; and

      G.      That the Court order such other relief as it may deem just and proper under the circumstances.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 22, 2020           Respectfully submitted,

                              *s/Johan Rosa*
                              **Assistant Attorney General**
                              U.S.D.C. 301108
                              P.O. Box 9020192
                              San Juan, Puerto Rico 00902-0192
                              Tel: (787) 729-2002
                              Fax: (787) 721-3223
                              E-mail: jrosa @justicia.pr.gov

                              Jane A. Becker Whitaker
                              **Becker & Vissepo, PSC**
                              U.S.D.C. 205510
                              P.O. Box 9023914
                              San Juan, Puerto Rico 00902-3914
                              Tel: (787) 945-2406
                              E-mail: jbw@beckervissepo.com
                              janebeckerwhitaker@gmail.com

Jean Paul Vissepo Garriga
**Becker & Vissepo, PSC**
U.S.D.C. No. 221504
P.O. Box 367116
San Juan, PR 00936-7116
Tel: (787) 945-2406
E-mail: jp@beckervissepo.com
jp@vissepolaw.com

Elizabeth A. Fegan
**Fegan Scott LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Direct: 312.741.1019
Fax: 312.264.0100
Email: beth@feganscott.com

John A. Girardi
**Girardi/Keese**
1126 Wilshire Blvd.
Los Angeles, CA 90017
Tel: (213) 262-6777
E-mail: jgirardi@girardikeese.com

J. Barton Goplerud
**Shindler Anderson & Goplerud, P.C.**
5015 Grand Ridge Drive, Ste 100
West Des Moines, Iowa 50265-5749
Tel: (515) 223-4567
E-mail:

*Attorneys for Plaintiff*